(No. 1607, December 31, 1914)

In the Matter of the Proceedings, Looking to the Disbarment of A. B. RENEHAN.

OPINION ON REHEARING.

RAYNOLDS, D. J.—The real facts in this case, as we understand them, may be briefly stated as follows:

The respondent, in June, 1908, was employed by one Antonio Faustin Lovato, in behalf of himself and his four brothers, to collect the amount of money due them under the $20,000 mortgage. The respondent had not solicited this employment, and had not theretofore had any relation with these five Lovatos, and he did not even know them. It was proposed by these Lovatos and agreed at that time, that he should receive one-third of the amount of the recovery. The fund out of which the recovery was to be had was a mortgage for $20,000, executed in February, 1905. At that time it was assumed that Antonio Faustin Lovato had acquired the interest of Jose Maria Lovato by deed, and that he would be entitled, consequently, to one-fourth of the entire fund, by reason of this conveyance. If this arrangement had been carried out, the respondent would have received $2,916.66, being made up of one-third of the Jose Maria Lovato interest; netting $5,000, after paying Mr. Howard $1,000, which would amount to $1,666.66, and one-third of $750 coming to the said Faustin for an interest he inherited, and one-third of $750 for each of his four brothers, amounting to $1,250. The respondent finally received $3,750 out of the transaction, but there were three other brothers not his clients from whom he received $350, each by purchase of their interests, amounting to $1,-

050, making a total of $3,966.66. The respondent never, at any time, bore any relation of attorney to any of the other Lovato heirs.

In June, 1908, Messrs. Tutt & Skinner, of Colorado Springs, took an option to purchase all of the Lovato grant for the sum of $175,000. This option ran until the 15th day of October, 1908, and was afterwards renewed, and was finally exercised by Messrs. Tutt & Skinner, on the 7th or 8th day of December, 1908.

At that time, George Hill Howard, trustee for the Lovato heirs, and to whom the mortgage had been executed for the $20,000, his son, G. Volney Howard, and afterwards substituted trustee, the respondent, Messrs. Tutt & Skinner, and Judge Ira Harris, met in Colorado Springs and effected a sale of the property to Messrs. Tutt & Skinner. The entire purchase price for the grant was either paid or arranged for at that time, except the money to pay off the $20,000 mortgage.

The testimony is not entirely clear as to what the understanding was between the parties as to just when this mortgage was to be paid, but all of them agreed that at that time the mortgage was to be assumed and paid. The respondent testified that it was agreed that the purchasers might take one year within which to pay off this mortgage, if they so elected, and that it was understood that they were not to pay any attorneys' fees or costs, but simply the amount of principal and interest. This mortgage at this time was, of course, long past due, but the Lovato heirs were represented by their trustee, and if he agreed that the purchasers might take a year to pay off the mortgage, it was probably binding upon them. Confirmation of the testimony of the respondent is to be found in paragraph two, of the option, which provided that upon the election to purchase, $105,000 should be paid, and $35,000 in six months thereafter, and $35,000 in twelve months thereafter.

While in Colorado Springs, a discussion was had between the parties as to the best method of collecting this money for the Lovato heirs. The respondent representing his five clients, at first talked a foreclosure for them as a means of enforcing the payment of the mortgage. It was

finally agreed by the parties and the respondent accepted employment from Messrs Tutt & Skinner to undertake to purchase and acquire assignments of the interests of all of the Lovato heirs which he could get, at as cheap a price as possible. He testifies that he wrote Antonio Faustin, the only one of his clients with whom he had had any correspondence, the full details of this arrangement from Colorado Springs. He was unable to produce a copy of the letter, but that he did write from Colorado Springs is evidenced by the fact that he received a reply dated December 12th, 1908, written by the daughter of Antonio Faustin, acknowledging the receipt of his letter, and the fact that he left Colorado Springs and went directly to California and did not return until after the 12th of December, 1908. In this letter of acknowledgment reference is made to the fact that the respondent had asked Antonio Faustin to send his deeds for interests of his brothers, and a statement is made that he had not bought the interests of his brothers, but that he had bought Jose Maria Lovato's share, and that the deed was in Mr. Howard's possession.

Upon the return of the respondent to Santa Fe, and on the 29th day of December, he prepared and sent out a large number of documents to Antonio Faustin Lovato, which are the assignments shown in this case. In the letter of transmittal, he asked Antonio Faustin to have Jose Maria Lovato sign on the back of an assignment an endorsed in Faustin's favor. He stated that such endorsement would be sufficient under the circumstances to enable him to collect the money, even in the absence of the deed which Jose Maria had given to Antonio Faustin, and which had been delivered to Mr. Howard, trustee.

In this letter of transmittal, the respondent failed to state the true amount, or any amount, to which his clients were entitled, respectively, out of the fund evidenced by the $20,000 mortgage. In this letter he says: "It is your interest and the interest of the several owners in money which you will obtain by executing the enclosed papers." These papers were sent out with amounts in money inserted therein as the purchase price for the respective inter-

ests. The four brothers of Antonio Faustin owned a one-thirty-second interest which would produce and be worth $750 to each. In those assignments the sum of $400 is inserted. He had a contract for one-third of the amount recovered, which would be $250, leaving the net amount, due the heirs, of $500. This state of affairs existed as to the four brothers of Antonio Faustin.

As to Antonio Faustin, there is much confusion in the testimony, but an assignment was produced in evidence in which the sum of $2,600 was inserted. The respondent was unable to account for this as he says that $2,600 bore no relation to any proposition which was ever discussed or written about between himself and Antonio Faustin.

These circumstances would be, standing alone, sufficient to cast a doubt upon the fair dealing of the respondent with his clients.

In explanation of this situation, the respondent states that he assumed that the trustee had informed the Lovato heirs of their rights under the mortgage. It was certainly his duty to do so, and there is no reason to doubt that he had performed that duty. The respondent further states that these assignments were sent out for the purpose of facilitating the preliminary arrangements for paying off the Lovato heirs, and were not final in character. This explanation seems reasonable, in so far as his own clients were concerned. He had not yet settled with his clients, and still retained the power to settle with them according to his original contract with them, and if his intentions were correct no harm had yet been done. He testifies that he had not accepted the assignments as a definite basis of settlement with his clients until his interview with Antonio Faustin of January 21, 1909, and that it was then agreed by the latter that his brothers should pay the same rate as the other heirs. Independently of any representations or the absence of explanation by the trustee or by the respondent, it is difficult for us to believe that out of nearly fifty persons, all of them should be ignorant of their rights under the mortgage. This mortgage had run nearly four years; was for $20,000; the estate had been partitioned and the fractional interests therein of

each claimant specifically set out, to which decree these Lovato heirs were parties. They had become dissatisfied at the long delay and had seen fit voluntarily to employ counsel to enforce their rights. Antonio Faustin indicates in his first letter in which he employed respondent for himself and brothers, that he knew the amount of acreage he owned in this tract. It does not seem to be within the domain of reasonable probability that all of these people could have been so ignorant and so devoid of intelligence as to be unable to ascertain for themselves the amount which was due them.

We therefore believe that they must have known what their rights were, independent of any information or lack of information from the trustee or the respondent.

In regard to Antonio Faustin Lovato it was discovered by the respondent that the interest of Jose Maria Lovato for which he had a deed had not been allowed to him by the decree of partition, but it had been awarded to Jose Maria Lovato, notwithstanding the fact of the deed. Jose Maria Lovato was represented by G. Volney Howard, trustee, who was claiming the entire interest for his client. Upon discovery the respondent wrote to Antonio Faustin, induced him to come to Santa Fe for a conference, which was had on the 21st day of January, 1909. In that conference the respondent testifies that he stated to his client that he thought under the circumstances one-third was 'not a sufficient fee; that the claim was doubtful and quite possibly would require litigation, which litigation was of doubtful result, owing to the laches of his client in allowing the matter to rest in that form for a long period of years. They discussed a compromise with Mr. Howard, as attorney for Jose Maria, but did not come to terms, and the respondent testifies that they finally agreed upon a new contract and relation, whereby respondent absolutely obligated himself to purchase his interest and to pay Antonio Faustin $2,000, in any event, a part of said agreement being that his brothers should take the same rate as the other heirs—viz: $400 for a one-thirty-second interest. It was stated above that the assignments were sent out with the purchase price filled in, but it is established by the evidence of a hand-

writing expert, that neither respondent nor any one for him in his office wrote the figures in the documents. Just who filled them in is not shown by the proofs. This is unimportant, however, as respondent does not claim that he did not intend to have the amount filled in for his clients, relying upon his explanation that the same were not intended to be acted upon by him until he had a conference with his clients.

As before stated, Antonio Faustin was the only one of his clients who employed respondent, and the employment was for himself and his four brothers. There were three more brothers whose interests were acquired by respondent for $400 each, but the relation of attorney and client is not shown to exist as to them.

In view of the foregoing facts, it would seem that there is a lack of that clear and convincing evidence of deceit of his clients in the first instance as' to the amounts due them which is necessary to disbar or punish an attorney therefor. We, therefore, find that this charge is not sustained in this particular.

It is now apparent that the whole case as to respondent's conduct toward his clients turns upon what occurred at the conference of January 21, 1909, between the respondent and Antonio Faustin, and his brother, Antonio Domingo Lovato. Antonio Faustin denied in toto the version of respondent as to what occurred. He says that respondent told him that the interest of Jose Maria Lovato which he had acquired was worth $3,200; and that respondent was to collect this amount for him. He denies the making of any contract for the payment of $2,000 to him in full for his interests. This witness is an old and infirm man, and shows throughout his testimony that his memory is unreliable. He is almost totally blind. He discloses gross discrepency in his testimony as to given facts at different times during his examination. He does impress us, however, with his intention to tell the truth so far as he is able to remember it.

Antonio Domingo Lovato, the brother, was also present at this conference. He confirms Antonio Faustin in his statement that the respondent told Antonio Faustin that

the Jose Maria Lovato share was worth $3,200. He contradicts Antonio Faustin in an important particular, however, namely: Faustin testified that no paper was read over to him, while Domingo testified that the paper was read over to Faustin, and that he, Domingo, at Faustin's request, signed the latter's name to the same. The paper referred to was an affidavit in regard to the circumstances attending the purchase of Jose Maria Lovato's interest, and of the delivery of the deed of conveyance to Mr. Howard. This affidavit was procured by the respondent for the purpose of attempting to recover this interest from Jose Maria. Generally speaking, there is an unusual identity of statement and form of expression by both of these Lovatos as to what occurred at the interview above mentioned: Again, in March, 1910, Domingo admits that a man by the name of Kutz informed him that he had not received the full amount of his money. Nothing was done by him or any of the other Lovatos until the fall of 1911. In the meantime, Domingo has been arrested, and wired the respondent to employ him in that matter. In the fall of 1911, Silviano Roybal, a bitter enemy of the respondent, became interested in informing the Lovatos of the fact that they had not received their just proportion of this fund, and assisted in the procurement of affidavits from many of them to that effect.

When respondent remitted to Antonio Faustin, he received a letter of acknowledgment, thanking him for his services in procuring the money. While this acknowledgment is not absolutely conclusive, Antonio Faustin knew, according to his own testimony, that the Jose Maria Lovato interest was worth $3,200, he claiming that the respondent had so informed him, and he knew that he also had an inherited interest of one-thirty-second, which was worth, at the rate the others were receiving, $400. It therefore appears that he must have known that the respondent should have remitted to him two-thirds of $3,200, which would be $2,133.33 and $400, which would make a total of $2,533.33. Notwithstanding this, his daughter, Sadie Lovato, who attended to all of his business and correspondence, and with whose actions he was shown to be

familiar wrote a letter of acknowledgment, expressing satisfaction at the receipt of $2,000, and with the services of respondent. This fact is strongly confirmatory of the respondent's version of the interview of January 21st. Antonio Faustin necessarily must have known upon the receipt of the remittance that it was for $533.33 less money than he had been informed by the respondent he was entitled to. This called for immediate inquiry on his part and explanation on the part of respondent.

From the foregoing circumstances and many others which might be extracted from the evidence, we do not feel justified in finding that the version of the respondent of the interview of January 21st, is untrue. It may, of course, be true that Antonio Faustin and Antonio Domingo did not fully understand the proposals and their agreements thereto on that occasion. It may be true that they might be entitled to recover this money from the respondent. But on the other hand, we do not believe that the respondent has fabricated his version of this affair, designed as it must be, in that case, to cover up what would otherwise be a treacherous and fraudulent transaction. To so hold would be to condemn him upon evidence which, under the circumstances, we do not consider of sufficient reliability. To so hold would be to convict him of being one of the most brazen crooks in the profession. He knew that all of the data from which computations of the amounts due each of the Lovatos were made was a matter of public record, and he knew that many different persons, including the trustee, whose duty it was to give the information to his beneficiaries, knew absolutely all of the facts. To convict him under the circumstances would be to convict him of being not only a rascal, but a fool, more brazen than the highwayman or the thief. This we do not believe, and therefore find that the charge in this particular is not sustained.

We cannot dismiss this portion of the case without a criticism of the methods employed. An attorney for the sake of his own good name, if for no other, should not allow a matter of this importance to rest in human memory, which is, as we all know, subject to so many frailties. A contract of this kind, if it is to be made at all, should be

reduced to writing so that the terms of the same may always be established. An attorney's dealings with his client being always subjected to the closest scrutiny of the courts, and justly so, ought to be expressed in no uncertain terms. He owes this to himself and to the profession to which he belongs as well as to the courts in which he practices. It injures the legal profession and the administration of justice in the opinion of the people to have such questions as these arise.

We have now arrived at the point where we have found that the respondent practiced no deceit, either in the first instance, or on the occasion of the interview of January 21, 1909.

There still remains the further question of whether the conduct of the respondent in dealing with his clients at all under the circumstances, was justifiable. His dealings with his clients prior to the interview of January 21st, has been heretofore treated, and it has been found by us that up to that time he had never treated the assignments from them as a complete and executed matter, and had obtained them simply for the purpose of facilitating the final settlement of the whole matter, at which time a proper settlement was to be made with his own clients. It nevertheless remains true that, after having accepted employment from Messrs. Tutt & Skinner in Colorado Springs, in December, 1908, he did, on January 21, 1909, contract with his clients for their interests in this fund, at a reduced rate from that which they would receive under his original contract of employment with them. If it is true, as stated by respondent, that he had found Antonio Faustin's claim to be of such a doubtful nature as that it would require litigation, with possible or probable failure as a result, and if he fully explained this to Faustin and Faustin agreed to a proposition to take $2,000 in any event for his interests, we know of no rule of law which prohibited such a transaction. It is not illegal for an attorney to buy his clients' property, no matter how impolitic it may be.

As to the interests of Antonio Faustin's four brothers, the same situation exists. The respondent bought their interests for $100 less to each than originally agreed,

through Antonio Faustin who had originally employed him for them, and who was their agent and representative at the interview of January 21, 1909.

We have heretofore found that these clients of respondent knew what they were doing when they made these assignments. There was nothing, therefore, illegal in what the respondent did, and he should not be disbarred for the same. The situation then, is, that respondent, without deceit on his part, purchased his clients' interests in this fund, at a profit to himself and others, with whom he was associated.

The attorney general urges that this conduct is deserving of punishment for the reason that it is violative of the ethics of the profession, in that he charged his clients for services which were not necessary, and charged them in excess of the value of the service rendered.

As to Antonio Faustin, we have heretofore seen that with his doubtful claim in regard to the Jose Maria interest, the respondent rendered him valuable service in assuring him of $2,000 in any event, at a time when the validity of the claim was greatly in doubt. It is clear that Faustin was greatly in need of the aid of an attorney at this time, in this matter. The amount of discount was very large but the character of the claim was certainly very doubtful. As to the inherited interests of Faustin and his four brothers, however, it was not necessary for them to pay more than they had already agreed to pay, viz: $250 each, leaving a net $500 to each of them. Respondent bought these interests for $400 each. The only basis upon, which this transaction can be placed, is the assumption of risk by respondent in promising Faustin the $2,000 at all events. But this arrangement in no way concerned Faustin's four brothers, and he had no right to use it against their interests. If he did not desire to assume the risk, he need not have done so. It was, therefore, a purchase of his client's interests in the fund at $100 less than he had contracted to get for them in the first instance, and there was no reason to make the charge. There was no controversy about their claim, and the money had already been provided to pay them. It required no labor on

respondent's part to get the money for them, except to re-ceive it and to disburse the same to them.

We cannot refrain from putting our stamp of disapproval upon such a transaction. We deem it without the ethics of the profession, as properly understood by the better class of its members, to overcharge a client, or to charge him for services which were not in fact rendered, even where there is no actual deceit as to the facts, as in this case.

The opportunities for overreaching are so great, and the client is usually so helpless, that attorneys must be held, by the better opinion of the profession, to fairness, not only as to the facts concerning his client's rights, but as to the amount of a reasonable charge for his services. But in this case the sum total of respondent's wrong doing was the taking of $100 from each of Faustin's four brothers. As before seen, it was not illegal to do so, but it was certainly not in accordance with the best standard of ethics. On the other hand, it is to be seen that the amounts taken were insignificant in comparison with the amount involved in the whole transaction. Respondent's conduct is not shown by the facts in this case to be an habitual and persistent course of conduct. It appears to be, simply, a sporadic instance of overreaching his clients. It furnishes no basis for the belief that his character is of such a nature as to render him an unsafe man to be clothed with the high powers of an attorney at law. If he habitually mistreated his clients in this way, showing thereby his lack of moral character and unfitness to be entrusted with their interests, in that event some basis for the action desired by the Attorney General might be discovered. We find no such facts exist.

This disposes of all of the transactions of respondent with his clients, and we hold that in that regard no sufficient cause for disbarment has been shown.

As to all of the other parties whose interests in this fund the respondent acquired, he owed them no duty as an at-torney, no such relations existing as to them. He acted as an ordinary broker, as to them.

As to this part of the transaction, some of the same considerations heretofore mentioned, would seem to apply. They were all represented by a trustee, and many of them by specially employed attorneys. The circumstances are such, as heretofore pointed out, that it seems impossible for any considerable number of them to be devoid of knowledge of what their rights were. He sent out the assignments to be executed for a given sum in each case. He did not in so many words say to them that their interests were worth some particular sum, and that he desired to purchase the same at a certain reduced price. He left them to their own option to accept or refuse. Some did refuse until they had consulted counsel.

The Attorney General urges that this transaction deserves punishment in that it shows such a want of moral character as to render the respondent unfit to continue as a member of the profession. The position of the Attorney General is, in a nut-shell, that, knowing that the money was forthcoming to pay these claims, and that the parties needed no attorney to collect them, the respondent had no right to purchase them at a profit to himself and his associates. If we understand this contention, it means that an attorney at law is held to a higher degree of ethics in his dealings with his fellow men, when the relation of attorney and client does not exist, than the ordinary citizen is, in the ordinary business transactions of life. The mere fact that a man is an attorney at law would seem, under the contention of the Attorney General, to surround him with restrictions not binding upon the ordinary business man. We do not so understand the law. An attorney at law, by reason of the confidence reposed in him by his client, is bound to the utmost fairness and the utmost integrity in safe-guarding his interests. If he violates this duty, he is subject to disbarment. This disbarment is not for the purpose of punishing an attorney, but it is for the purpose of protecting the public against a man who, by reason of his confidential relations with his clients, has the power to impose upon them and to defraud them in a way and to an extent which the ordinary citizen could not do. But when an attorney steps aside from his duties

as a member of the profession, engages in business affairs of any character with persons, who repose no special confidence in him, and to whom he owes no personal obligations, we know of no rule of law which compels him to be more careful than the ordinary business man. It was not intended by the original opinion to lay down the proposition that in dealing with persons not his clients, an attorney was at liberty to disregard all the obligations of an honest man. If the court is satisfied that the conduct of a lawyer is governed by such a low moral standard that he is unfit to practice law, he should be disbarred, whether his dealings are with his clients or others. But such conduct by the respondent is not shown here.

Of course in the profession of the law, there are degrees of professional ethics. One member of the profession may govern his life by the highest and most refined rules of conduct; another in the same profession, by reason of his origin, his environment and his education, may view things from an entirely different standpoint. It is highly desirable that all members of the profession should be guided by the principles first mentioned.

It is, however, a fact patent to every observer of human nature, that no absolute standard of ethics is to be established by any court or by any board or governing body of any profession. We have, as a matter of law, no code of ethics. It therefore remains with each member of our profession to govern himself according to his own light, and it is only when he violates some law, and brings thereby upon himself and upon the profession to which he belongs, and upon the administration of justice in which he is engaged, disgrace and ridicule, and when his general conduct renders him unsafe to deal with the public, clothed as he is with the great powers which he possesses as a member of the bar, that courts are authorized to expel him from this membership.

The Attorney General urges that the respondent's alleged misconduct toward a brother member of the bar, Thomas B. Catron, is not only established by a preponderance of the evidence, but is such as to require punishment of the respondent. We do not so understand this record.

We do not desire to find, and we do not find, that a reputable member of the bar has misrepresented the facts in this case, but we are compelled to say that the testimony bears some internal evidence of mistake, and, under the circumstances, we do not deem it sufficient to disbar any attorney practicing in this court. The facts are that the data from which the rights and interests of the clients of Mr. Catron could have been ascertained, rested in public documents which it was his duty to inspect before be made any settlement in their behalf. He had no right to take the word or assurance of any other person. It became his duty when he was employed by his clients, to examine into their rights, and the means were at hand which would furnish complete evidence on the subject. Mr. Catron knew at the time he dealt with the respondent that respondent's interests were antagonistic to his, and that he was employed by Messrs. Tutt & Skinner to acquire the interests of his, Catron's, clients. It therefore devolved upon Mr. Catron to satisfy himself from the records, and not from some person representing interests opposed to his clients, as to the amount to which they were entitled in this settlement. The interviews had between Mr. Catron and the respondent were of Mr. Catron's seeking, and not of the respondent's. It was the duty of Mr. Catron to see to it that no imposition was practiced upon his own clients, and he had no right to rely upon the respondent. For these reasons, as was pointed out in our former opinion, we do not deem it necessary to pursue this branch of the case further. We pointed out in our former opinion, that the respondent denied all of the material facts testified to by Mr. Catron, and stated that he made no representations to Mr. Catron whatever, as to the true amount due each of the Lovato heirs.

Of course, if it is true that the respondent deceived Mr. Catron as to his, Catron's, clients' rights, it shows a low order of morals and one most unbecoming a member of our profession. But we cannot believe, under all the circumstances, the respondent was so devoid of discretion as to place himself in such a position as is claimed. As has been pointed out heretofore, he knew that the evidence of the rights of these clients of Mr. Catron rested in public

documents, that numerous persons knew of their contents and that his deceit, if he practiced deceit, must very soon come to light. It seems, therefore, that it is unreasonable to believe that he made these representations to Mr. Catron, and it is believed by us, that the controversy between the parties is the result of a mistake rather than a deliberate fraud on the part of the respondent.

All of these matters we discussed in our former opinion, in a somewhat more general form, but the urgent insistence by the Attorney General that we had made a mistake in our conclusions, seemed to us to warrant this further discussion.

On the whole record, as indicated in our former opinion, we fail to find that the charges of fraud and deceit have been maintained by the quantum of evidence required in such a case. As we pointed out in the opinion, the question as to whether a recovery might not be had by the Lovato heirs, or some of them, against the respondent, is not for determination in this proceeding. In the particulars pointed out herein, we do find that respondent's conduct was not governed by the highest and most correct rules of professional ethics. We do determine, however, as we did in our former opinion, that the alleged causes for disbarment have not been established to our satisfaction, and do not exist, and we therefore adhere to our former opinion.